**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **KEITH WILSON,** Plaintiff, | § | |
| | § | |
| | § | **CIVIL ACTION NO. 5:26-CV-07023** |
| v. | § | |
| | § | |
| **BEXAR COUNTY, TEXAS, AND** | § | |
| **LARRY ROBERSON** | § | |
| Defendants. | § | **JURY TRIAL DEMANDED** |

**PLAINTIFF KEITH WILSON'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL**

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

Plaintiff Keith Wilson ("Plaintiff" or "Wilson") files this Original Complaint against Defendant Bexar County, Texas ("Defendant," "Bexar County," or the "County") and Defendant Larry Roberson for retaliation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq., violations of 42 U.S.C. §1983 and respectfully alleges as follows:

## I. NATURE OF THE ACTION

1. This action arises from Bexar County's alleged retaliation against Wilson after he opposed employment practices and conduct that he reasonably believed constituted unlawful discrimination against employees within the Bexar County Department of Military and Veterans Services ("DMVS"), and after he later filed and pursued an EEOC charge concerning that retaliation.

2. Wilson served as Executive Director of the Bexar County Department of Military and Veterans Services ("DMVS") and County Veterans Service Officer from September 2022 until his termination on March 10, 2026. Nancy Taguacta was a longtime County employee

who served as the Deputy Director of DMVS until her resignation and forced retirement in October 2025.

3. In August 2025, Wilson received complaints from no less than two employees, Kendra Cook and Marsha Covington, working under Taguacta, of being subjected to discriminatory, abusive comments, bullying and a hostile work environment by Taguacta. Given Taguacta's long tenure with the County and close relationships with certain County Commissioners and the County Judge at the time, as well as her being a member of at least two protected classes (Hispanic and over 40), instead of seeking immediate termination for behavior that violated the County's policies and expose the County to a potential wrongful termination suit (that without an investigation would make difficult to defend), Wilson swiftly requested these complaints be investigated by Bexar County Ombudsman Allison Highley – not merely as a relaying of these complaints – but to take immediate, justified remedial action including termination to behavior which he personally and professionally opposed and sought to eliminate from his department. Wilson did not possess unilateral authority to terminate Taguacta and was required to pursue appropriate administrative channels, including the Ombudsman's investigation, to substantiate the allegations and support any resulting disciplinary action.

4. Among the communications Wilson forwarded to the Ombudsman was an employee communication with subject line "We need your help!" alleging retaliation and bearing the heading "ONLY FEMALES BEING TERMINATED." Wilson did not merely forward these complaints to the Ombudsman; he expressly stated, "I want to address these concerns," and requested that the Ombudsman investigate the allegations, "expand as appropriate," and provide recommendations based on the results so that he could determine

and pursue appropriate corrective action up to and including termination, if warranted by the investigative findings. Through these affirmative communications, requests, and stated intent, Wilson actively opposed conduct he reasonably believed could constitute disability discrimination involving employees with mental health conditions, including PTSD, as well as sex-based discrimination and retaliation.

5. The Ombudsman subsequently investigated complaints concerning Taguacta, though never provided fully investigative findings including statements taken of employees subjected to what they perceived as Taguacta's tyranny, while Wilson was out of the main office and following up on matters at other campus locations spread across the city. On October 13, 2025, the Ombudsman substantiated complaints concerning Taguacta, who thereafter separated from County employment, under terms of incentivized resignation in lieu of termination – where, as part of her severance, based on information and belief she agreed to waive and release the County from any claims in law or equity.

6. Following Wilson's August 2025 opposition activity, the County subjected Wilson to an escalating series of actions, including an internal audit, a formal Performance Improvement Plan ("PIP"), pressure to consider leaving County employment, paid administrative leave, restrictions on communications with County employees, an external investigation, and ultimately termination. At the time that Highley reported back her conclusions, County Attorney Larry Roberson said in the meeting back-to-back, he did not "know how the county would survive this" and then turned to Wilson multiple times and said he did not "know how [Wilson] would survive this."

7. On December 2, 2025, during this escalating course of events, Wilson filed a formal grievance with his direct supervisor, County Manager David Smith, alleging that the PIP and

conflicting directives constituted unlawful retaliation for his protected activity, including his reporting of ADAAA-related employee complaints and his request for an independent investigation through the County Ombudsman so that he “could address these concerns.”

8. Following Wilson's December 2, 2025 formal grievance alleging unlawful retaliation and his placement on administrative leave on December 10, 2025, Bexar County almost immediately initiated the retention of Caldwell Clark Fanucchi & Finlayson, PLLC (CCFF), to provide outside legal representation "related to a personnel matter and review of a complaint." The final agreement establishing CCFF's engagement was made approved by Commissioners Court on or about January 20, 2026 and made the engagement effective December 16, 2025, just 14 days after Wilson's specific allegation of unlawful retaliation. In contrast to its initial characterization as a review of a complaint, the County would subsequently acknowledge, that Wilson "had asserted claims of discrimination, communicated with legal counsel, and subsequently filed an EEOC charge,” and expressly stated that “[t]he retention of outside counsel and the initiation of a formal legal investigation occurred in direct response to these developments” in order to “assess potential liability and formulate legal advice in anticipation of claims.”

9. On or about January 28, 2026, and again on or about February 2, 2026, Wilson was exhaustively interviewed for more than five hours in total by Michael Shields of CCFF. The questioning extended well beyond the allegations contained in Wilson's original PIP and into matters the County would later invoke as proffered grounds for his termination and float to the media, without having presented those allegations to Wilson or afforded him an opportunity to rebut them before his termination.

10. On February 17, 2026, Wilson filed EEOC Charge No. 451-2026-02496 alleging retaliation and continuing action based on his opposition to discrimination. See attached hereto a true and correct copy of Wilson's EEOC Charge I, as Exhibit 1.

11. After Wilson filed Charge No. 451-2026-02496, the retaliation continued to escalate. On March 9, 2026, County Attorney Larry Roberson sent correspondence concerning Wilson's communications with potential employee witnesses. On March 10, 2026, the Bexar County Commissioners Court voted to terminate Wilson's employment.

12. On March 23, 2026, Wilson submitted a second charge concerning his retaliatory termination. That matter was assigned EEOC Charge No. 451-2026-03114. See attached hereto and incorporated by reference, Wilson's EEOC Charge II, as Exhibit 2.

13. On August 5, 2026, the EEOC issued a Determination and Notice of Rights as to Charge No. 451-2026-02496. The EEOC stated that it would not proceed further with its investigation, made no determination as to whether further investigation would establish a statutory violation, and issued Wilson notice of his right to sue on that charge. Attached hereto is a true and correct copy of Wilson's Right to Sue on Charge I, as Exhibit 3.

14. On August 19, 2026, the EEOC issued its second Right to Sue on Charge No. 451-2026-03114. Attached hereto is a true and correct copy of Wilson's Right to Sue on Charge II, as Exhibit 4.

**II. PARTIES**

15. Plaintiff Keith Wilson is an individual and former employee of Bexar County, Texas.

16. Defendant Bexar County, Texas is a political subdivision of the State of Texas and an employer within the meaning of Title VII. Wilson's EEOC charges identify Bexar County as employing more than 500 employees.

17. Defendant Larry Roberson may be served with process through the officer or agent authorized by law to receive service at his official business address or anywhere that is found.

## III. JURISDICTION AND VENUE

18. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under Title VII, 42 U.S.C. §§ 2000e et seq. This Court also has jurisdiction under 42 U.S.C. § 2000e-5(f)(3).

19. Venue is proper in the Western District of Texas, San Antonio Division, because the employment practices complained of occurred in Bexar County, Texas; Wilson worked for Defendant in this District; and relevant employment records are maintained and administered in this District.

## IV. ADMINISTRATIVE PROCEEDINGS AND CONDITIONS PRECEDENT

A. Charge No. 451-2026-02496

20. On February 17, 2026, Wilson filed a Charge of Discrimination with the EEOC and Texas Workforce Commission Civil Rights Division against Bexar County. The matter was assigned EEOC Charge No. 451-2026-02496.

21. In Charge No. 451-2026-02496, Wilson checked "Retaliation" and "Continuing Action." He alleged that, as Director of DMVS, he reported possible violations of USERRA and the Americans with Disabilities Act by a subordinate employee to the County Ombudsman in August 2025, and that the County thereafter subjected him to an unusual audit, a 90-day PIP, pressure to quit, paid administrative leave, restrictions on

communications, an exhaustive forensic inspection of all content on his phone, including cookies from his related personal Google email accounts that preceded his employment with the County, and release of the PIP to local media. Wilson concluded his charge with the belief that he had "been discriminated against because of [his] opposition to discrimination in violation of the Americans with Disabilities Act, and Title VII of the Civil Rights Act of 1964."

22. The Charge expressly alleged that Wilson believed he had been discriminated against because of his "opposition to discrimination" in violation of the Americans with Disabilities Act and Title VII of the Civil Rights Act of 1964.

23. During the EEOC proceedings, Wilson further explained that his August 2025 opposition to unwelcome and prohibited conduct by Taguacta included forwarding employee complaints concerning reported discriminatory and retaliatory conduct, concerns regarding the treatment of female employees and employees with mental-health conditions, including PTSD; personally expressing his own concerns and explicitly stating, "I want to address these concerns;" and requesting that the Ombudsman look into the concerns, expand her review as appropriate, and provide recommendations based on the results so that he could take appropriate action.

24. Bexar County submitted a Position Statement to EEOC disputing that Wilson engaged in protected activity and disputing causation. The County contended, among other things, that Wilson merely routed generalized workplace concerns in the ordinary course of his managerial duties and that the audit, PIP, administrative leave, and public disclosure had independent, non-retaliatory explanations. Yet the County fails to explain why Wilson, who had served more than three years without prior disciplinary action or documented performance deficiencies, was placed on a disputed PIP on October 23, 2025, just one day

after being briefed on substantiated findings against Taguacta. Those findings followed longstanding complaints to elected County officials concerning Taguacta, who was subsequently permitted to resign in lieu of termination, many of which were unbeknownst to Wilson in August 2025 when employees complained of her treatment. County Attorney Larry Roberson's October 22, 2025 prognostication that he did "not know how [Wilson] will survive" the findings concerning Taguacta materialized the following day with the issuance of the PIP, which the County subsequently relied upon in justifying further adverse actions against Wilson.

25. Wilson responded that his August 2025 communications went beyond neutral routing: he forwarded employee complaints alleging retaliation and sex-based discrimination to the Ombudsman, communicated his own concerns and desire to address the reported conduct, and requested that the Ombudsman substantiate and document these concerns, expand her review as appropriate, and provide him with evidence to back up disciplinary actions as was appropriate. The underlying communications also documented concerns regarding employees with mental-health conditions, including PTSD.

26. On August 5, 2026, the EEOC issued a Determination and Notice of Rights concerning Charge No. 451-2026-02496. The notice closed the EEOC investigation without a merits determination and advised Wilson that any federal lawsuit based on that charge must be filed within 90 days after receipt of the notice.

27. This action is timely filed within the 90-day period applicable to Charge No. 451-2026-02496.

B. Charge No. 451-2026-03114 and Post-Charge Retaliation

28. After Wilson filed Charge No. 451-2026-02496, Bexar County's continued to construct grounds upon which to ultimately terminate his employment.

29. On March 23, 2026, Wilson, through counsel, submitted a second EEOC Charge concerning his March 10, 2026 termination. The matter was assigned Charge No. 451-2026-03114.

30. In Charge No. 451-2026-03114, Wilson alleged that after his earlier discrimination charge, employees contacted him and, during those communications, he asked whether they would speak with his attorney about his situation. He alleged that County Attorney Roberson thereafter sent correspondence asserting that Wilson and counsel could not speak with witnesses without permission, and that on March 10, 2026, someone appeared in closed session before Commissioners Court and recommended his termination, after which the Commissioners Court voted to terminate him.

31. Charge No. 451-2026-03114 alleged that Wilson suffered additional retaliation because of his opposition to discrimination under Title VII and the ADA.

32. On August 19, 2026, the EEOC issued its second Determination and Notice of Rights concerning Charge No. 451-2026-03114. The notice closed the EEOC investigation without a merits determination and advised Wilson that any federal lawsuit based on that charge must be filed within 90 days after receipt of the notice.

33. This action is timely filed within the 90-day period applicable to Charge No. 451-2026-03114.

34. Wilson alleges that the March 2026 retaliatory termination grew out of the earlier Charge and his participation in the EEOC process.

## V. FACTUAL ALLEGATIONS

A. Wilson's Position and Opposition to Perceived Discrimination

35. Wilson served as Executive Director of DMVS, an executive-level position with responsibility for departmental leadership, administration, and supervision.

36. Nancy Taguacta, a more than 30-year employee with Bexar County, served as Deputy Director of DMVS, a senior leadership role within the department. Taguacta had previously served in the Department of Community Resources before being reassigned to DMVS following allegations of misconduct she made against another County employee that Wilson was subsequently informed by County Manager David Smith and former Commissioner Kevin Wolff were purportedly false. During her more than 30 years of County employment, Taguacta developed longstanding relationships with senior County officials, several of whose offices subsequently received complaints concerning her conduct. County records obtained by Wilson, after his being released and prior to the institution of this suit, reveal that complaints specifically involving Taguacta had been directed to Commissioner Justin Rodriguez's office in 2020. Following those complaints, Taguacta was appointed Interim Director of DMVS, serving in that capacity for approximately one year before Wilson assumed leadership in September 2022. Additional complaints involving Taguacta were directed to County Judge Peter Sakai's office in 2023. Neither the 2020 nor the 2023 complaints to elected County officials were disclosed to Wilson during his tenure, including when he assumed leadership of the department. Furthermore, during the FY2024–25 budget process, the County approved formally converting the Interim Deputy Director position to Deputy Director, and Taguacta subsequently held that position. Wilson alleges that despite longstanding complaints concerning Taguacta, senior County leadership permitted her to remain in positions of departmental leadership without adequately addressing those concerns

or putting her on any training that would have addressed behavior and comments which violated the County's policies and federal law. The County failed to inform Wilson of these former complaints, yet subsequently relied upon those same personnel problems to criticize his leadership and justify adverse employment actions against him after he requested an independent investigation into allegations that Taguacta had engaged in unlawful discrimination against County employees.

37. In late July and early August 2025, Wilson began receiving concerns from employees regarding comments and conduct attributed to Deputy Director Nancy Taguacta, including concerns regarding treatment of employees, retaliation, and the impact of the reported conduct on employees with mental-health conditions.

38. On or about August 1, 2025, after receiving the initial employee complaint, Wilson coordinated to personally meet with the employee to gather additional information regarding her concerns and discuss how to move forward. During those communications, Wilson expressed his own concern regarding comments attributed to Taguacta and their reported impact on female employees and employees with mental-health conditions, including Veterans with PTSD, which Wilson believed could constitute unlawful discrimination and a violation of the ADAAA.

39. On or about August 5, 2025, after meeting with the employee, Wilson forwarded her original complaint to Ombudsman Highley, stated that he wanted to address the concerns, and requested that the Ombudsman look into the concerns, expand her review as appropriate, and provide recommendations based on the results so that he could "address these concerns."

40. On or about August 13, 2025, Wilson forwarded to Highley another employee complaint for inclusion in the requested review. The complaint alleged targeting, bullying,

harassment, and retaliation by Taguacta; included the heading "ONLY FEMALES BEING TERMINATED"; and identified concerns involving employees with mental-health conditions, including anxiety, adjustment disorder, depression, and PTSD.

41. Wilson alleges that, viewed in context, his communications, objectively and subjectively reflected, expressed concerns and his explicit desire to eliminate and remedy such behavior within his department. His actions constituted more than merely forwarding employee complaints or reporting potential violations of County policy, they demonstrated Wilson's active and express opposition to conduct he reasonably believed could constitute disability discrimination, sex-based discrimination, and retaliation.

42. On October 22, 2025, Ombudsman Allison Highley and County Attorney Larry Roberson met with Wilson to discuss the Ombudsman's substantiated findings concerning Deputy Director Nancy Taguacta. other than Roberson's inaccurate assertion that Wilson was "included on emails in which [he] took no action"—referring to the very complaints Wilson had forwarded to the Ombudsman expressly requesting an investigation so that he "could address these concerns"—neither Highley nor the County Attorney identified or suggested that the investigation had established any failure by Wilson in the performance of his duties. Taguacta was subsequently afforded the opportunity to resign in lieu of termination, retire from County employment, and receive a substantial separation payment, given the circumstances.

43. On October 23, 2025, just one day after being briefed on the Ombudsman's findings and making good on Roberson's prognostications, Wilson was presented with a PIP by County Manager David Smith despite having received no expressions of concern about his performance of duties, issuance of any warnings, oral reprimands, written reprimands or other

adverse disciplinary action in more than three years with Bexar County. During the October 23, 2025 meeting in which Smith presented the PIP, Smith told Wilson that "Larry [Roberson] wants to wipe the leadership slate clean in the department," but Smith explained that he did not believe doing so was the right course of action for the organization. Wilson alleges that, following Roberson's statement the preceding day questioning how Wilson would "survive this," Smith's disclosure that Roberson wanted to "wipe the leadership slate clean," and the unexpected issuance of the PIP, he began to believe that County leadership was attempting to pressure him into resigning or establish grounds to terminate his employment. Wilson further alleges that Roberson's assertion during the October 22 meeting that Wilson had failed to act upon employee complaints—when Roberson was referring to the very emails Wilson had forwarded to the Ombudsman requesting an investigation, expanded as appropriate, so that he could "address these concerns"—combined with Smith's disclosure of Roberson's desire to replace departmental leadership, raised serious concerns about Roberson's active influence over employment decisions involving Wilson and whether his recommendations to County leadership were based upon a materially inaccurate understanding of the underlying facts.

B. Internal Audit and Performance Improvement Plan

44. In May 2023, Wilson reviewed draft findings of an Ombudsman investigation concerning, among other matters, internal controls over donated items, though he does not recall ever receiving a finalized report. Nevertheless, contemporaneous County records reflect that, during that same month, Wilson's department contacted the County Auditor's Office and requested assistance with internal policy development and a courtesy inspection concerning donated items.

45. Following Wilson's August 2025 opposition to the reported conduct and his request for an expanded Ombudsman investigation, the Bexar County Auditor's Office notified Wilson on October 6, 2025, that DMVS had been selected for an audit as part of "the Internal Audit Division's annual audit plan." Contrary to the County's initial representation, the County subsequently asserted in its April 20, 2026 EEOC Position Statement that an outstanding recommendation from the May 2023 Ombudsman investigation had resurfaced during the September 2025 investigation and prompted the October 2025 audit. In a sworn declaration dated April 20, 2026, and submitted with both the County's April 20 and May 5, 2026 EEOC Position Statements, Highley stated:

> *"Upon review, I determined there was no indication that the recommended audit or related coordination with the Auditor's Office had been implemented. I contacted the Auditor's Office to confirm whether any such request had been made. The Auditor's Office confirmed that it had not received any request from Mr. Wilson or the Department regarding the recommended audit or related assistance."*

46. Highley's sworn statement, made nearly three years after the underlying events and following Wilson's termination, directly contradicts contemporaneous County email records documenting DMVS's May 2023 coordination with the Auditor's Office and its request for assistance concerning donated items and refinement of an internal department policy. Notably, Highley never contacted Wilson to determine whether he or his department had coordinated with the Auditor's Office concerning the 2023 recommendation or undertaken any related corrective action. Moreover, on or about February 2, 2026, Wilson provided those County email records to Michael Shields of Caldwell Clark Fanucchi & Finlayson ("CCFF") during the County's external investigation. Despite having been provided these contemporaneous records during the external investigation, the County's April 20, 2026 EEOC Position Statement continued to characterize the 2023 recommendation as unfulfilled.

47. Wilson disputes the County's explanation for the audit and alleges that the audit was initiated not as a routine administrative review, but as part of a deliberate effort to scrutinize his leadership and identify potential deficiencies that could be used to justify adverse employment action or his eventual termination. Wilson further alleges that the audit's timing following his protected opposition, the County's shifting explanations for its initiation, and its subsequent reliance on assertions contradicted by contemporaneous County records demonstrate retaliatory motive and support a finding of pretext.

48. On October 23, 2025, one day after Wilson was presented with the Ombudsman's findings concerning Taguacta—which identified no finding or deficiency concerning Wilson's performance or leadership—and Roberson decried his fears of the County's liability associated with her actions and that Wilson would not be able to survive the findings, which supported his opposition and desire to take remedial action, backed by upper management, County Manager David Smith placed Wilson on a 90-day PIP. During that meeting, Smith told Wilson that Roberson wanted to "wipe the leadership slate clean." Notably, Wilson had not been interviewed as part of the Ombudsman's investigation into Taguacta's conduct, nor had he been afforded an opportunity to respond to the specific performance deficiencies identified in the PIP before its issuance one day after he was briefed on the Ombudsman's findings.

49. The County contends that the PIP formalized pre-existing concerns regarding supervisory engagement, administrative oversight, and executive-level responsibilities. However, prior to Wilson's placement on the PIP, the County never raised any concerns identified in the PIP to him with any specificity or seriousness prior to then. Wilson contends that his placement on the PIP was motivated, at least in substantial part, by his expressed opposition to Taguacta's practices and Roberson's explicit desire to clear the decks of any

remnants associated with Taguacta's actions and investigation. Notably, the County's alleged "concerns" that prompted the Bexar County Auditor's Office review earlier that month were not identified in the PIP as an "Area of Concern" or included among its "Required Improvements and Performance Standards." Defendant Bexar County has in this regard and in several others, adopted one position, only to then advance another later with the EEOC or leading up to Wilson's wrongful termination.

50. On or about October 27, 2025, following a meeting with former Commissioner Kevin Wolff, Wilson met with County Manager David Smith to rebut the PIP. Wilson had prepared handwritten notes on a copy of the PIP, reflecting his intended approach to the meeting, including his starting assumption that the PIP had been developed with good intentions based on a superficial understanding of the Ombudsman's findings, without political or ulterior motives, and noted that nobody had sought his input before its issuance. During the meeting, Smith acknowledged that the PIP had been issued in response to the Ombudsman's investigative report concerning Taguacta. Wilson then provided a detailed response to the PIP and its three specified areas of concern: "Lack of Availability and Presence," "Inappropriate Delegation of Core Responsibilities," and "Failure to Identify and Address Misconduct." He explained that his responsibilities required substantial field presence, satellite-office work across ten (10) different locations, community engagement, and coordination beyond a conventional office schedule as reflected in the formal job description. He identified weekly leadership meetings, text and email coordination, and his availability to staff as evidence of active supervision and appropriate delegation of responsibilities to departmental managers and supervisors. Wilson further explained that employees had

routinely brought workplace concerns directly to him, demonstrating that his physical absence from the headquarters office did not prevent employees from accessing him when needed.

51. In response to the PIP's allegation that he failed to identify and address misconduct, Wilson reviewed with Smith a chronological account of actions he had taken over the preceding three years to address personnel concerns, including his coordination with Human Resources, County Legal, the Ombudsman, and the County Manager's Office. Wilson emphasized that he routinely involved and kept the appropriate County offices informed of personnel matters and consistently sought and followed their advice and guidance in determining appropriate corrective actions.

52. Beyond responding to specific complaints, Wilson had established a formal supervisory hierarchy, implemented recurring one-on-one meetings with staff, routinely visited departmental service locations to engage directly with employees, and maintained a visible presence at community events involving departmental personnel. These measures were intended to strengthen supervisory accountability, facilitate communication, and provide opportunities to identify and address employee concerns before they escalated. The County's subsequent external investigative findings, however, characterized Wilson's leadership as "reactive rather than proactive" and acknowledged that he had forwarded complaints to the Ombudsman's Office and other departments, while asserting that he had failed to undertake additional affirmative corrective measures. Wilson contends that this represented a material shift from the PIP's allegation that he failed to recognize or act upon reported misconduct to the subsequent criticism that his corrective measures were insufficiently proactive, a subject he maintains was never specifically raised during more than five hours of interviews with the external investigators.

53. Wilson proposed that the PIP "go away as if it was never issued" and that, instead, he would develop a Department Action Plan ("DAP") with 30-, 60-, and 90-day actions, assigned responsibilities, benchmarks, metrics, training, a climate survey, and organizational improvements. Wilson further explained to Smith that, rather than characterizing the circumstances as a failure of departmental leadership, he believed a more accurate account was that employees had sufficient trust and confidence in their leadership to bring workplace concerns directly to him, and that those concerns were subsequently elevated and addressed through coordination with appropriate County offices, including Human Resources, the Ombudsman, County Legal, and the County Manager's Office. Wilson further stated that the department was already pursuing additional corrective, organizational, and communication-focused measures intended to address workplace concerns and strengthen departmental operations. Although he was later advised that the PIP was never retracted, he was never given any guidance as to his progress on the PIP, any concerns by management or provided by Human Resources any tools or training on points raised – though the County's policies provide that Defendant would encourage and enable employees with training to meet various competencies within their position. This was never offered to Wilson.

54. From October 27 through October 30, 2025, Wilson discussed the DAP with County Manager Smith multiple times and understood that the DAP would supersede or replace the formal PIP process. Wilson was not instructed during those discussions to continue separate PIP reporting requirements. Indeed, Wilson's meeting with Smith and Smith's lack of opposition or countering of his DAP, led him to believe that the County Manager accepted his counter proposal as a replacement to the PIP. Later he would be advised by Deputy County Manager Thomas Guevara that the PIP was never retracted, but without

the benefit any guidance or feedback as to his perceived progress on the PIP by management or Human Resources. Wilson was neither provided any training on alleged management deficiencies identified in the PIP – though the County's policies provide that Defendant both encourages and facilitates employees to undergo training to develop competencies, as their position may require. This was never broached much less offered to Wilson.

55. Wilson alleges that the County later continued to rely on the PIP and alleged deficiencies in compliance with it despite the direction he had received concerning the DAP.

C. Statements, Pressure to Leave, and Administrative Leave

56. During the October 22, 2025 meeting concerning the Ombudsman's findings, County Attorney Larry Roberson expressed concern regarding the significant potential liability the County faced because of the findings, including potential financial exposure and adverse public perception. Roberson claimed that Wilson would not be able to "survive" the investigation because Wilson allegedly failed to act on the emails from the Ombudsman. Roberson's construction of the timeline was flawed, as it was Wilson who initiated the dialogue with Highley about rooting out and remedying behavior and actions which he perceived likely violated federal law and the County's policies against a workplace riddled with abuse, harassment and discrimination. Wilson confirmed that the emails Roberson referenced were the same emails Wilson had forwarded to the Ombudsman as part of his request for an outside review, which Highley acknowledged during the meeting. The County disputes Wilson's interpretation and contends that there should be consequences for departmental leadership for failing to immediately terminate Taguacta. However, Wilson maintains that terminating an employee with more than thirty years of County service, who was also a member of two

protected classes, without first conducting a thorough investigation and substantiating the allegations could have exposed the County to even greater legal liability.

57. On December 2, 2025, Deputy County Manager Thomas Guevara met with Wilson concerning implementation of the Department Action Plan ("DAP") and the status of the disputed Performance Improvement Plan ("PIP"), with Ombudsman Allison Highley present. When Wilson stated that the PIP was being held over his head, Guevara responded, "It is… like a whip to the carrot." Guevara further stated, in substance, "If this isn't a good fit for you, then maybe you need to look for something else." He also asserted that Wilson had an internal "image problem" without identifying any supporting facts or examples.

58. Guevara then mounted additional training and accreditation requirements as conditions for reconsideration of the PIP, despite Wilson's prior completion of applicable state certification requirements and his understanding that such conditions had not previously been imposed. During the same meeting, Guevara imposed new restrictions concerning Wilson's interactions with his girlfriend, who held a leadership position in a separate County department and who reported outside of Wilson's leadership. Guevara questioned whether Wilson had consumed alcohol during working hours without identifying any factual basis for the inquiry. Wilson alleges that these statements and directives, considered together with the County's continued refusal to rescind the disputed PIP, reflected shifting performance expectations, the use of the PIP as grounds staging for further disciplinary actions – which he contents reflects an escalating pattern of disparate scrutiny and retaliatory treatment following his protected opposition.

59. The County contends that the December 2, 2025 meeting raised workplace-conduct and safety concerns, including behavior it subsequently characterized as

confrontational and insubordinate – yet took no immediate action on its later constructed concerns associated with that meeting. In sworn declarations dated April 20, 2026, submitted with the County's April 20 and May 5, 2026 EEOC Position Statements, and more than four months after the meeting and following Wilson's March 10, 2026 termination, Guevara and Highley described concerns about a possible physical confrontation. Curiously, Wilson was never presented with anything about these concerns close in time, no write up was issued alleging these concerns, and no police or law enforcement was called to the Smith's office or thereafter interviewed Wilson as to the same.

60. Neither Guevara nor Highley advised Wilson during or following the December 2 meeting that his conduct was considered threatening, that he had been insubordinate, or that he presented a workplace-safety concern. Nor was Wilson subjected to any contemporaneous warning, disciplinary action, or restriction on his workplace access. Instead, the County permitted Wilson to continue performing his regular duties for the following eight days, including participating in a County Judge-hosted Food Security Summit on December 10, 2025, alongside numerous County officials and community partners. Although the County subsequently asserted that a security presence had been arranged for the delivery of Wilson's administrative-leave order on December 10, 2025, Wilson observed no security personnel present or visible when Guevara and Highley delivered that order – which is customary of the County in circumstances where there are legitimized concerns of risk. Wilson alleges that the absence of contemporaneous protective or corrective action, the County's continued authorization of his public-facing duties, and the subsequent presentation of sworn allegations of feared physical confrontation only after his termination collectively undermine the County's

stated justification and support an inference that these concerns were exaggerated or advanced after the fact as a pretext for retaliatory employment actions.

61. Immediately following the December 2 meeting, Wilson submitted a formal written grievance to County Manager David Smith seeking clarification regarding the continued status of the PIP in light of the DAP and expressly alleging that the PIP and conflicting directives constituted unlawful retaliation for his protected activity, including his reporting of ADA-related employee complaints. In his grievance, Wilson expressly requested "Written assurance that no adverse action will be taken against me pending full resolution of this grievance."

62. The County also contends that information came to its attention regarding transmission outside County channels of an attachment in the formal grievance containing unredacted employee medical or mental-health information. Wilson disputes that characterization, including because the recipient at issue was his personal attorney, whom Wilson had copied on his formal grievance concerning alleged unlawful retaliation. Under Texas Law and Disciplinary Rules of Conduct, Wilson was well in his right to keep his then counsel informed of the situation.

63. The County relies upon Policy 7.5.04, a broadly worded confidentiality policy that does not expressly prohibit disclosure to a personal attorney or define what constitutes an authorized County channel. Wilson does not recall ever having received or been trained on this policy during his onboarding or the duration of his time with the County. County records subsequently obtained by Wilson confirm that County Attorney Larry Roberson transmitted the same document to the same recipient only hours later. Those records further reflect no comparable investigation, disciplinary action, or developmental action involving Roberson arising from that transmission. In effect, the County's complaint about Wilson's release of

information, while Roberson himself transmitted the same document to the same recipient hours later without comparable consequences, undermines its claims of a violation of County policy or, alternatively, reflects active targeting and selective, inconsistent, and arbitrary enforcement of its policies.

64. In correspondence dated December 2 and 3, 2025, County Attorney Roberson personally accused Wilson of improperly disclosing confidential County information to his personal attorney, Zachary Boyd. On December 2, Roberson stated, "This is, at its core, Mr. Wilson's sole problem now. He committed the unauthorized disclosure in potential violation of state and federal law." The following day, Roberson further asserted that "it is reasonable to conclude that the purpose of copying you was to create the appearance of legal representation and to intimidate or otherwise exert pressure on County staff." These accusations were made despite Wilson's express statements that he was attempting to resolve the disputed PIP and allegations of retaliation internally and administratively, and that Boyd had *not been retained to pursue litigation concerning those matters*.

65. Boyd challenged Roberson's characterization, questioned his "seeming hostility," and identified Roberson's own transmission of the same grievance attachment to him. Boyd further observed that Roberson had done "the exact same thing that you are accusing Keith of doing." Boyd further objected, "I don't think I deserved to be dealt with so aggressively," explained that "Keith is a long time friend and client," and clarified that, until formal legal proceedings or litigation arose, "you can consider my role more advisory in nature, to Keith." Moreover, Roberson's correspondence was copied not only to County Manager David Smith, Deputy County Manager Thomas Guevara, and Ombudsman Allison Highley, whom Wilson had included in his original grievance, but also to Matthew Polanco, the County Judge's Chief

of Staff, and Meredith MacIntire, a Civil Division attorney, whom Roberson added to the distribution. Wilson alleges that Roberson's direct involvement in these communications, including his attribution of improper motives to Wilson's formal grievance and communications with his personal attorney and his circulation of those accusations among additional County officials, represents further evidence that Roberson was not merely providing independent legal advice to County leadership but was actively participating in efforts to discredit Wilson, undermine his grievance, and justify subsequent adverse employment actions.

66. Shortly thereafter, on December 10, the County placed Wilson on paid administrative leave pending an investigation and restricted his communications with County employees, thereby straining his ability to manage and oversee the department and undermining his ability to address the concerns in the PIP.

67. The County soon after receiving Wilson's grievance and request that no adverse action be taken against him while his grievance was being considered, retained outside counsel at a cost not to exceed $100,000 to conduct **a** new investigation – which was to pivot on and about Wilson. In an April 9, 2026, filing with the Texas Attorney General, the County stated that Wilson had "asserted claims of discrimination, communicated with legal counsel, and subsequently filed an EEOC charge," and that "[t]he retention of outside counsel and the initiation of a formal legal investigation occurred in direct response to these developments" with the stated purpose "to assess potential liability and formulate legal advice in anticipation of claims." They would go on to reiterate in the same document, "From the outset, it was understood that the law firm and attorneys working on this matter were acting in an official

legal capacity to evaluate potential liability, assess allegations, and provide legal counsel to the County."

68. In its subsequent May 5, 2026 EEOC Position Statement, however, the County characterized the investigation as arising from pre-existing performance and conduct concerns and as having begun before Wilson filed his EEOC charge. Here again, the County has adopted evolving and contradictory rationales for its actions, that are undermined by a Commissioners Court agenda on December 16, 2025 to retain CCFF for representation related to "a personnel matter and review of a complaint." Significantly, in the County's subsequent June 1, 2026 correspondence with the State Attorney General, they would once again contradict their statement to the EEOC and again state that Wilson "had asserted claims of discrimination, communicated with legal counsel, and subsequently filed an EEOC charge" and acknowledged that initiation of a formal legal investigation occurred "in direct response to these developments." Wilson alleges that, as the County confronted its potential liability arising from his allegations of discrimination and unlawful retaliation, the external investigation shifted from assessing the County's legal exposure to an increasingly expansive effort to scrutinize, target, and discredit the very employee who had requested an independent investigation into allegations of misconduct involving a 30-year County employee. Wilson further alleges that this shift served to develop adverse findings against him and construct a purported justification for his eventual termination.

69. Wilson alleges that, although his December 2, 2025, grievance expressly raised concerns that the PIP and conflicting directives constituted unlawful retaliation, the County conducted no apparent investigation into those allegations and never interviewed him regarding their factual basis. Instead, just eight days after submitting his grievance and

requesting protection from further adverse action, Wilson was placed on administrative leave and subsequently became the subject of the external investigation.

70. On or about January 28, 2026, and again on or about February 2, 2026, Wilson was exhaustively interviewed by Michael Shields of CCFF as part of the County's external investigation into Wilson's conduct and leadership, following Wilson's opposition to discriminatory conduct by Taguacta that had been substantiated through a separate investigation by the County Ombudsman. During these interviews, Wilson specifically informed Shields that Taguacta had previously been transferred into DMVS following allegations and concerns involving her conduct in another County department. Shields acknowledged that he had not previously been aware of those circumstances. Wilson alleges that this information was directly relevant to the County's subsequent criticism of his leadership and oversight of Taguacta, particularly given that these circumstances predated his appointment as Executive Director.

71. The extensive questioning of Wilson, which continued for hours, expanded into matters the County would later use as proffered grounds for termination—allegations it subsequently floated to the media but never presented to Wilson before his termination or afforded him an opportunity to rebut. At the conclusion of the February 2, 2026 interview, Wilson directly expressed concerns to Shields, stating in substance, “After being placed on a PIP, having restrictions placed on me [concerning my relationship with Heather Andreas, my girlfriend and a fellow County employee], being placed on administrative leave, and now this investigation, it feels like y’all are just looking for something to hold against me.” Wilson thereby expressly placed the County's outside investigator on notice that he believed the escalating adverse actions and expanding investigation were directed toward identifying

grounds for disciplinary action against him rather than objectively addressing the underlying allegations of discrimination and retaliation he had formally raised to the County Manager. Wilson alleges that these baseless or sensationalized claims, and the County's disparaging public characterizations of his termination made with careless disregard for the truth, have contributed to his repeated rejection for positions for which he is well qualified, including through their potential discovery in prospective employers' background checks.

72. The CCFF investigative findings alleged that Wilson engaged in "inappropriate physical contact, which could be interpreted as sexual in nature," involving another County employee at an unidentified community event, characterizing the allegation as a "substantiated report" while referencing purported inappropriate "public displays of affection" supposedly observed by a third party. Wilson alleges that this accusation arose only after his demonstrated opposition to discriminatory conduct and his December 2, 2025, grievance alleging unlawful retaliation. No such allegation appeared in his October 23, 2025, Performance Improvement Plan, nor had Wilson received contemporaneous notice, investigation, or corrective action concerning the purported incident. Wilson cannot identify any corresponding event after issuance of the PIP where this alleged event may have occurred and was placed on administrative leave December 10, 2025, thereafter attending no community events in an official capacity. Notably, despite more than five hours of CCFF interviews, investigators never identified the alleged event, date, or reporting individual to Wilson or questioned him about the accusation before declaring it substantiated.

D. Public Disclosure of the PIP

73. In early January 2026, Wilson learned that his PIP had been released to local media.

74. The County contends that the PIP was produced in response to a Texas Public Information Act request, that no statutory exception applied, and that the disclosure was a ministerial act required by law, notwithstanding that the PIP had been disputed both informally and formally, a formal grievance had been filed, allegations of retaliation had been raised, and an investigation involving the PIP had been initiated effective December 16, 2026.

75. Wilson alleges that the disclosure nevertheless contributed to the escalating public and professional consequences he experienced after his protected opposition. He pleads the disclosure principally as part of the chronology and context of the alleged retaliation and pretext.

E. Wilson Files Charge No. 451-2026-02496

76. On February 17, 2026, while still employed by Bexar County, Wilson filed Charge No. 451-2026-02496.

77. The filing placed Bexar County on express notice that Wilson claimed the audit, PIP, pressure to resign, administrative leave, communication restrictions, and related treatment were retaliation for his opposition to discrimination.

78. Filing and participating in the EEOC charge process constituted protected activity under the ADA and Title VII.

F. Witness Communications and March 2026 Termination

79. While Charge No. 451-2026-02496 was pending, Wilson, on advice of counsel, began identifying persons with firsthand factual knowledge regarding his leadership, accessibility to staff, responsiveness to employee concerns, the PIP, and the retaliation allegations.

80. Wilson alleges that he limited his outreach to individuals with direct knowledge and advised potential witnesses that participation was voluntary. He did not ask anyone to provide false information, conceal information, or disregard County directives, nor did he seek to have County-level management officials whose conduct or decisions were implicated in his complaint or allegations contacted. Although certain individuals contacted held supervisory or leadership positions within Wilson's department, they were potential fact witnesses with firsthand knowledge of matters relevant to his allegations, rather than County officials whose conduct or decisions were themselves at issue.

81. On March 9, 2026, at approximately 8:04 a.m., Wilson emailed an EEOC Supervisory ADR Coordinator documenting his concern that his recent contacts with department members could be used as justification for additional discipline or termination. The effect of the County's actions was to tie Wilson's hands behind his back and stonewall any attempts by him to defend claims of his not being accessible or available to lower-level employees in his department or being ineffectual, while it undertook a one-sided investigation that they did not give him an opportunity to counter and respond to.

82. At approximately 10:18 a.m. that same day, County Attorney Roberson sent correspondence to Wilson's counsel concerning Wilson's contacts with County employees and asserted that communications regarding the EEOC charge should be directed through his office.

83. At approximately 11:29 a.m., Wilson forwarded that correspondence to the EEOC and reiterated his concern that County leadership and Legal were attempting to restrict or control access to employees with relevant knowledge.

84. On March 10, 2026, while Wilson was out of state on previously approved leave, Commissioners Court convened and entered executive session concerning personnel matters involving Wilson's position.

85. After executive session, a motion was made to terminate Wilson's employment and appoint an interim director. Commissioners Court voted unanimously in favor of the motion. The County has represented that the termination decision was based "exclusively on the investigative record and findings presented to the Court" and the Court's independent evaluation of that record.

86. Wilson was notified of his termination on March 11, 2026, while still out of state. The investigative records and findings allegedly relied upon by the County in reaching its termination decision were never furnished or otherwise disclosed to Wilson, nor was he afforded an opportunity to review or respond to those findings before the March 10, 2026 Commissioners Court session at which his termination was approved. This treatment stood in stark contrast to the County's handling of Deputy Director Nancy Taguacta, against whom allegations of discrimination had been substantiated, yet who was permitted to review the investigative findings, determine her course of action, submit a handwritten resignation, and arrange for her retirement from County employment the following day, October 31, 2025. The County also offered Taguacta a $25,000 separation payment in Wilson's presence, rather than proceeding directly with termination.

87. Related to Roberson's March 9 restrictions on contacting potential witnesses, Wilson's then-attorney, Thomas Crane, challenged the scope of those restrictions in correspondence dated March 11 and March 18, 2026, asserting that attorneys have an affirmative legal responsibility to conduct a reasonable factual investigation before initiating

litigation and that Roberson's position improperly restricted access to potential witnesses whose conduct was not at issue. Despite these objections, Roberson maintained his position in correspondence dated March 27, 2026, directing that requests for interviews or information involving represented County employees proceed through his office.

88. On April 2, 2026, Crane again challenged Roberson's failure to distinguish employees whose conduct was implicated in Wilson's allegations from employees who merely possessed relevant factual knowledge and requested identification of the DMVS employees the County considered represented. Wilson alleges that Roberson's direct intervention in his efforts to obtain potentially corroborating witness information, followed by his continued insistence upon disputed restrictions despite repeated objections from Wilson's attorney, represented yet another instance in which Roberson moved beyond providing legal advice to County leadership and actively participated in actions that impeded Wilson's ability to independently investigate, substantiate, and pursue his allegations of unlawful discrimination and retaliation.

89. Wilson alleges that the timing and sequence of the termination—approximately three weeks after his first EEOC charge and one day after the dispute concerning communications with potential witnesses—along with previously placement on a PIP one day after Roberson said Wilson would not be able to survive, retention of counsel to conduct a second investigation involving Plaintiff soon after he submitted his grievance in which he expressly alleged that he was being subjected to unlawful retaliation, establish a proximity of time between engaging in protected activity and resulting actions that in retrospect can be shown to be adverse and used to construct the County's narrative for its wrongful termination of Plaintiff.

G. EEOC Charge No. 451-2026-03114

90. On March 23, 2026, Wilson submitted his second EEOC charge concerning his termination and related post-charge retaliation.

91. The second charge alleged that Roberson had become involved in restricting communications with witnesses after Wilson's first charge and that Commissioners Court terminated Wilson the following day.

92. The EEOC assigned the second matter Charge No. 451-2026-03114. The Commission issued its Right to Sue on August 19, 2026.

H. Pretext and Causation Allegations

93. Bexar County has articulated several non-retaliatory explanations for the challenged actions, including a pre-existing audit recommendation, pre-existing performance concerns, workplace-conduct and confidentiality concerns supporting administrative leave and investigation, a pre-existing and independently initiated external investigation, and mandatory public-information obligations concerning release of the PIP.

94. Wilson denies that those explanations account for the timing, sequence, escalation, and manner of the County's actions.

95. Wilson alleges that before August 2025 he had not been subjected to the same combination of formal discipline, administrative leave, communication restrictions, external investigation, and threatened or actual separation that followed his opposition activity.

96. Wilson alleges that the PIP followed one day after he was presented the Ombudsman's findings substantiating complaints involving Taguacta, which identified no finding or deficiency concerning Wilson's performance or leadership, and that County officials simultaneously criticized Wilson for allegedly failing to address the very personnel concerns

that he had elevated to the Ombudsman for review and recommendations regarding appropriate action "to address these concerns" involving discriminatory treatment brought directly to him by staff.

97. Wilson alleges that his proposed DAP and documented efforts to address departmental issues were initially accepted as the operative corrective framework, yet the County later relied upon the PIP and alleged noncompliance as adverse evidence against him.

98. Wilson alleges that the County's scrutiny intensified after he filed Charge No. 451-2026-02496 and that his employment was terminated approximately three weeks later.

99. Wilson further alleges that the termination occurred one day after the County Attorney challenged communications with potential non-County management **OR** potential employee witnesses with firsthand knowledge witnesses and within one day of Wilson placing those concerns before the EEOC. Bexar County sought to silence and styme any attempts of Wilson to Reply to the EEOC statements proffered by Defendant.

100. Wilson alleges that the County's stated reasons, considered together with the chronology, disputed factual premises, differing explanations concerning the origin and purpose of the external investigation, shifting focus of the investigation, statements by decisionmakers or senior County officials, and close temporal relationship to protected activity, are pretextual or otherwise support an inference of retaliatory causation.

101. Wilson alleges that but for his protected opposition to perceived disability and sex-based discrimination and his subsequent participation in the EEOC process where he confirmed his opposition to Taguacta's actions which he reasonably believed were in violation of the ADAAA and Title VII, Bexar County would not have subjected him to the materially adverse actions alleged herein and would not have terminated his employment.

## VI. COUNT ONE - TITLE VII RETALIATION FOR OPPOSITION TO DISCRIMINATION 42 U.S.C. § 2000e-3(a)

102 Wilson incorporates the preceding paragraphs as if fully set forth herein.

103. Title VII prohibits an employer from discriminating against an employee because the employee opposed a practice made unlawful by Title VII.

104. Wilson engaged in protected opposition when he forwarded employee complaints expressly raising sex-based treatment and retaliation to the County Ombudsman, communicated his own concerns and desire to address the reported conduct, and requested that the Ombudsman review the concerns and provide recommendations based on the results.

105. Wilson held a reasonable, good-faith belief that the conduct he opposed could violate Title VII and ADAAA.

106. Bexar County knew of Wilson's opposition activity.

107. After that activity, Bexar County subjected Wilson to actions that, considered individually where actionable and collectively as context, could dissuade a reasonable employee from making or supporting a complaint of discrimination, including formal discipline, pressure to leave, administrative leave, communication restrictions, investigation, and ultimately termination.

108. The timing, sequence, knowledge of Wilson's opposition, substantiation of underlying employee complaints, statements attributed to County officials, and disputed explanations for the adverse treatment plausibly support a causal connection.

109. Wilson alleges that the County's stated reasons are pretextual and that, but for Wilson's protected opposition, the materially adverse actions complained of would not have occurred.

110. Defendant thereby violated Title VII, 42 U.S.C. § 2000e-3(a).

## VII. COUNT TWO - TITLE VII RETALIATION FOR PARTICIPATION IN THE EEOC PROCESS 42 U.S.C. § 2000e-3(a)

111. Wilson incorporates the preceding paragraphs as if fully set forth herein.

112. Wilson's filing and pursuit of EEOC Charge No. 451-2026-02496 constituted protected participation under Title VII and ADAAA.

113. Bexar County knew that Wilson had filed the Charge.

114. After Wilson filed the Charge, the County continued its investigation and restrictions concerning Wilson. A dispute then arose concerning Wilson's communications with potential employee witnesses regarding his EEOC claim.

115. On March 9, 2026, Wilson notified the EEOC that he feared his witness contacts would be used to justify further discipline or termination. Later that morning, County Attorney Roberson sent correspondence challenging those communications. Wilson promptly forwarded the correspondence to the EEOC.

116. On March 10, 2026, Commissioners Court voted to terminate Wilson's employment.

117. Termination is a materially adverse employment action. The close temporal relationship to Wilson's EEOC charge and the March 9 witness-communication dispute, together with the other facts alleged, plausibly supports retaliatory causation.

118. Wilson alleges that, but for his protected participation in the EEOC process, Bexar County would not have terminated his employment.

119. Wilson presented the termination retaliation allegations to the EEOC in Charge No. 451-2026-03114.

120. Defendant thereby violated Title VII, 42 U.S.C. § 2000e-3(a).

## VII. VIOLATIONS OF 42 U.S.C. §1983

121. Larry Roberson used or misused authority granted by the government to carry out the misconduct, of prohibiting Wilson from engaging in his constitutional right to free speech by prohibiting him from communicating with non-management as to claims associated with his PIP and first EEOC Charge and exacting his termination from the Commissioner's Court, based on such recommendations the following day.

122. Based on information and belief, Roberson either personally or in his official capacity authorized, condoned, or sanctioned the publication of a statement released by the County alleging that Wilson's termination was based, in part, on his purported access to pornographic or adult-oriented material while employed by the County and performing his official duties. In support of this allegation, the County relied upon information obtained through a forensic examination of Wilson's County-issued cellular device and associated accounts, conducted after Wilson filed his formal grievance claiming illegal retaliation and the County retained an outside law firm at a cost not to exceed $100,000. Wilson alleges that the information identified by the County included historical metadata associated with his devices and Google account, including personal bookmarks and website references, some predating his County employment by several years. Such information may be automatically synchronized or stored in the background across associated devices without the user's knowledge or affirmative action.

123. Wilson disputes that this metadata establishes that he accessed or attempted to access pornographic material through County equipment, during working hours, or while performing official duties. Certain information also relates to periods when Wilson was away from work on approved leave. Although Wilson acknowledges that accessing pornographic

material while performing official duties could violate County policy, the mere existence of historical bookmarks, synchronized account information, or website-related metadata does not establish when, where, how, or on which device any underlying activity occurred. The County has not provided Wilson with the complete forensic examination or underlying data necessary to substantiate its allegations.

124. Wilson further alleges that, had the forensic evidence established actual or attempted access to such material in the performance of his official duties, the County would have identified that conduct directly rather than relying upon ambiguous technical references to metadata. Wilson alleges that the County's characterization of this information was intentionally misleading, designed to discredit him and portray personal, historical, or off-duty digital activity as workplace misconduct. Wilson further alleges that the County's dissemination of these assertions, despite the availability of information concerning their historical or personal nature and the foreseeable harm to his reputation, constituted **negligence** ***{Please*** that caused substantial damage to his personal and professional reputation once released to the public.

125. Wilson further alleges that Roberson's involvement in the investigation conducted by Caldwell Clark Fanucchi & Finlayson ("CCFF") extended beyond merely providing independent legal advice to County leadership. The County's own January 20, 2026 Commissioners Court records expressly established that CCFF's lead attorney, Brittany Malloy, "will report to Larry Roberson of the District Attorney's Office on the status of any legal work performed." The Professional Services Agreement further provided that CCFF, "upon request, will report to Larry Roberson or his designee" and would "work with attorneys in the Bexar County Criminal District Attorney's Office to determine scope of representation

and current status of pending matters and proceed as required." Moreover, in its April 9, 2026 correspondence to the Texas Attorney General, the County acknowledged that CCFF conducted its investigation "under the direction and supervision of County attorneys" and was instructed to "report solely to the Civil Division attorneys assigned to the matter and to provide information exclusively to them."

126. These express reporting, coordination, and supervisory arrangements stand in contrast to the County's subsequent characterization of Roberson's involvement as strictly administrative and limited to logistical oversight. Wilson alleges that Roberson's designated role, together with his broader involvement in the matters underlying the investigation, supports a reasonable inference that he knew, or should have known, the scope of CCFF's investigative activities, the methods used to obtain information, and the nature of the findings subsequently relied upon by the County in terminating Wilson's employment. Wilson further alleges that Roberson's participation in, direction of, or deliberate indifference toward the subsequent public dissemination of allegedly defamatory assertions concerning pornographic content derived from historical metadata predating Wilson's County employment or associated with a personal device while Wilson was on approved leave, together with the County's failure to issue a correction or retraction clarifying that such allegations did not form a basis for his termination, constituted gross negligence and foreseeably damaged Wilson's personal and professional reputation.

## VIII. DAMAGES AND RELIEF

127. As a direct and proximate result of Defendant's unlawful retaliation, Wilson has suffered and continues to suffer lost wages, lost employment benefits, loss of future earning

capacity and/or front-pay damages, emotional pain, suffering, inconvenience, mental anguish, and other compensable losses to the extent recoverable under the ADAAA and Title VII.

18. Wilson seeks back pay and other equitable monetary relief authorized by 42 U.S.C. § 2000e-5(g), compensatory damages subject to applicable statutory limitations, prejudgment and post-judgment interest, reasonable attorney's fees and costs, and appropriate equitable and declaratory relief.

129. Wilson seeks punitive damages under 42 USC §1983, against Bexar County employee Larry Roberson as said County employees acted with malice or reckless disregard of truth published to local media that its decision to terminate Plaintiff was in part due to its discovery of pornographic material on his business cellular phone, which included archived and old Google bookmarks from his personal account that was utilized years prior to his employment. The County's insertion of this misleading and false information – as to content which was mined as part of an extensive forensic testing by an expert that long preceded his employment with the County and where that report was not furnished to Wilson -- would lead any reasonable person to conclude that the alleged pornographic material was elicited and harvested during his period of employment when it was not.

Such a throwaway inserted grounds for his termination, though knowingly false was made with actual malice or reckless disregard of the truth. As a result, Plaintiff has not been able to secure employment despite being well qualified for other positions, where he has applied only to be rejected after the prospective employers likely complete a background check where the media statement tying Wilson's termination in part to use, enjoyment and participation in prurient activities while working for the County has had a devastating,

irreparable adverse effect emotionally and financially upon him, such that his reputation in the community has been permanently tarnished.

130. Wilson reavers that the County knowingly and/or recklessly relied upon an inadequate investigation, deliberately characterized the purported conduct in sexually suggestive and misleading terms, and publicly disseminated the unverified allegations with the intent of discrediting Wilson and damaging his professional reputation. Wilson alleges that the County's decision to release the CCFF findings despite their known investigative deficiencies constituted malice negligence. Taken together, these circumstances raise serious questions about how an allegation lacking any disclosed factual foundation, identifiable incident, or corroborating evidence could reasonably have been characterized as substantiated, which Wilson contends exposes Bexar County to punitive damages based on such unvetted release to the media.

## IX. JURY DEMAND

131. Wilson demands a trial by jury on all issues so triable.

## X. PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff Keith Wilson respectfully requests that Defendant Bexar County, Texas and Larry Roberson be cited to appear and answer that, after trial, the Court enter judgment in Wilson's favor and award:

a. A declaration that Defendant retaliated against Wilson in violation of the ADAAA and Title VII;

b. Back pay, lost benefits, and other equitable monetary relief;

c. Reinstatement or, if reinstatement is not feasible or appropriate, front pay;

d. Compensatory damages to the extent permitted by law and subject to applicable statutory limitations;

e. Punitive damages, to the extent allowed by law, as to Defendant's actual malice and/or reckless disregard of the truth of its fabricated grounds for termination under §1983;

e. Prejudgment and post-judgment interest;

f. Reasonable attorney's fees and litigation expenses pursuant to 42 U.S.C. § 2000e-5(k) and as authorized under the ADAAA;

g. Taxable court costs;

h. Appropriate equitable and injunctive relief; and

i. All other relief, at law or in equity, to which Wilson may show himself entitled.

Respectfully submitted,

**Amsberry Law Firm, PLLC**
24165 IH 10 W. Ste. 217, #230
San Antonio, Texas 78257
Telephone: (210) 354-2244
Email: r.amsberry@amsberrylaw.com

By: /s/ Russell J. G. Amsberry
**Russell J. G. Amsberry**
State Bar No. 00790228

**ATTORNEY FOR PLAINTIFF**
KEITH WILSON